## NEUKOM v. NORTH BUTTE MINING CO.*
### No. 7440.

Circuit Court of Appeals, Ninth Circuit.
June 1, 1936.

P. E. Geagan, of Butte, Mont., for appellant.

Charles R. Leonard and J. A. Poore, both of Butte, Mont., for appellee.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

This action was brought by Central Hanover Bank, as trustee for bondholders, to foreclose a mortgage securing $595,000 worth of bonds issued by defendant North Butte Mining Company, a corporation of Minnesota. By various pleadings and stipulations, it was made to appear that plaintiff trustee had sufficient moneys paid it by defendant to satisfy all bond-

*Rehearing denied Sept. 21, 1936.

holders in full; and the issue narrowed to the validity of eight North Butte bonds in the face amount of $1,000 each. These bonds had been in the possession of John W. Neukom, formerly an officer and director, and later receiver of the defendant company. Defendant in its answer claimed that the bonds were invalid, never having been lawfully issued to Neukom. Nan Neukom, the party in whose interest the suit was brought, received whatever interest her husband, John W. Neukom, held in the bonds, by way of gift.

The First & American National Bank of Duluth filed a complaint in intervention, alleging that the eight bonds in question had been pledged to it by John W. Neukom; that to the extent of the pledge it was a holder in due course.

On the issues thus framed, the cause came on for trial. The District Judge found that the eight bonds had been appropriated by Neukom "without corporate authority," without consideration, and "in fraudulent breach of trust." He further found that, to the extent of its pledge, the intervener was a holder in due course and entitled to payment. A decree was entered, requiring the plaintiff trustee to satisfy the intervener's claim out of the funds paid to trustee by defendant, and requiring that upon such payment the bonds be delivered up by intervener to be cancelled.

Nan Neukom took this appeal in the name of the trustee, not questioning the right of the intervener to satisfy the amount of its pledge, but asserting that she was entitled to the excess over such pledge; thus raising the sole issue before this court for consideration, viz., whether the bonds were validly issued by the company to John W. Neukom.

The evidence was conflicting in many particulars. For the most part it consisted of oral testimony. For this reason, the findings of the trial judge are entitled to great weight in this court. Keller v. Potomac Elec. Co., 261 U.S. 428, 444, 43 S.Ct. 445, 67 L.Ed. 731; National Reserve Ins. Co. v. Scudder (C.C.A.9) 71 F.(2d) 884, 888. A careful examination of the evidence convinces us that the trial court was right in concluding that Neukom received the bonds without valid corporate authorization, and that therefore between him or his donee and the company the bonds do not represent binding obligations.

The North Butte Mining Company had general officers in New York. Pursuant

to the law of Minnesota, the state of its incorporation, it maintained an office in Duluth, in that state, for the purpose of receiving service of summons there, and for any other business that might be required of it. Neukom was in charge of this statutory office during 1926 and 1927, and received for office expenses $50 per month. During the year 1926 he was also assistant secretary of the corporation. He was a director of the corporation between February 23, 1926, and November 7, 1927. For his services as assistant secretary he received $100 per month.

Some time during the spring of 1926 (just when does not appear) a merger was effected between the North Butte Mining Company and Tuolumne Copper Company. Neukom claims that he rendered special services in connection with this merger (for which services the bonds were given him) both during 1926 and at a much earlier period, between 1920 and 1923, at which earlier time he had carried on negotiation with officers of the two companies in respect to a merger. His evidence indicates that in 1925 he approached Atwater, president of North Butte, and Cotton, North Butte's general counsel, with respect to drawing compensation. for the earlier work as well as with respect to future services by Neukom in connection with the contemplated merger, and compensation for such future services.

Neukom's testimony tends to show that special services, outside the scope of his duties as an officer or director, were rendered during 1926, in connection with the North Butte-Tuolumne merger; that it was agreed between him, Atwater, and Cotton, that his compensation for all special services in connection with the merger, both during 1926 and before, would be $10,000; $2,000 was to be paid in cash, and the remaining $8,000 in bonds.

Pursuant to his understanding with Atwater and Cotton, Neukom presented to the company a bill for special services on October 14, 1926. This bill was duplicated in a receipted voucher, dated December 30, 1926. The voucher was taken from the company's files and received in evidence. It reads:

"Duplicate of statement rendered October 14, 1926:

"Special services rendered in connection with North Butte Tuolumne merger; analysis of merger agreement; with report on closing merger; report and opinion affecting charter analysis capital structure on stock issue and exchange treasury stock situation; set up of merger and exchange of stock from legal and accounting standpoints; preparation of date in financing bond sale campaign; miscellaneous consultations, conferences, etc., $10,000.00.

"Payment of above account is to cover settlement in full for all services rendered in calendar year 1926.

"Received in full payment of the above amount North Butte Mining Company 10 Year 7% Convertible Bonds with $4.00 stock purchase and conversion warrants attached amounting in the aggregate face value $8,000., and $2,000. in cash.
      "[Signed]   John W. Neukom."

The voucher bore the certification of Atwater, president, and the approval of Kennedy, treasurer, of the company.

There was introduced in evidence the minutes of the regular meeting of the board of directors of the company held in New York City on December 28, 1926. Present were Atwater, Cotton, Kennedy, Neukom, one William P. Jahn, and others. The minutes recite:

"On motion duly made, seconded and carried, the following resolution was unanimously adopted:

"Resolved: That the acts of the Executive Officers in the sale of $8,000. of the Company's First Mortgage 10 Year 7% Convertible bonds carrying stock warrant option on the basis of $4.00 per share be, and the same hereby is, in all respects approved, ratified and confirmed."

The bonds in suit were mailed to Neukom in New York.

There are two journal entries in the company's records, the first one crossed out, showing debit of $8,000 to general expense, and $8,000 credit to "First Mortgage Bonds * * * delivered to John W. Neukom in full settlement of services rendered re North Butte Tuolumne Merger Bonds M301/8 inc. $1,000." These entries were carried into the ledger of the company.

In addition to the $8,000 of bonds and $2,000 cash paid Neukom in accordance with the voucher which we have quoted, he received from the corporation at least $5,925, over and above his salary, during 1926 for special services in connection with the North Butte-Tuolumne merger. This $5,925 was made up of several amounts, each represented by a voucher. It does not

appear by what corporate authority they were paid.

Two of the defendant company's by-laws are material:

"Article VI, Section 2. No agreement, contract or obligation (other than checks in payment of indebtedness or incurred by authority of the Board of Directors) involving the payment of moneys or the credit of the Company for more than Ten Thousand Dollars ($10,000) shall be made without the order of the Board of Directors or of the Executive Committee acting as such."

"Article VI, Section 7. No director or executive officer of the company shall be entitled to any salary or compensation for any services performed for the company unless such salary or compensation shall be fixed by resolution of the Board of Directors or of the stockholders."

It is the plaintiff's contention that the board's resolution of December 28, 1926, ratifying the action of the executive officers in the "sale" of $8,000 of the company's bonds, was a sufficient compliance with article VI, section 7, to make the issuance of the bonds a valid exercise of corporate authority. It is also urged that article VI, section 7, applies only to salaries or compensation of directors and officers as such, that it does not apply to special services rendered by an officer or director outside the scope of his official duties, and that for such special services an officer or director under article VI, section 2, may receive compensation up to $10,000 by contract with the president or general counsel of the corporation without a resolution by the board.

The defendant introduced evidence tending to show that Neukom did not render all the special services for which the bonds are claimed to have been given him, and that he had already been paid for any such services which he did render.

Taking the voucher of December 30, 1926, upon which Neukom's claim to the $8,000 bonds and $2,000 cash was based, and considering each item therein separately, evidence shows the following:

"*Special services rendered in connection with North Butte Tuolumne merger.*" Neukom testified that by this statement he meant the services rendered by him in the period 1920–23. There is no proof showing he performed such services at the request of the officers of North Butte, or under any contract, express or implied, with that company. Witness Paul A. Gow testified that he was a director and general manager of Tuolumne at the time of these alleged services, that Neukom had some conversation with him relative to the sale of some Tuolumne properties to North Butte, but that there was no talk of merger.

"*Analysis of merger agreement; with report on closing merger.*" Neukom admits he had nothing to do with the drawing up and signing of the merger agreement. His explanation of this item is: "The agreement had been signed and prepared and delivered prior to the time that I made the analysis of this agreement. The necessity of making the analysis was because of the mix-up in connection with the increase in the authorized capital stock, and the attempt at the same time to effect any reduction in the outstanding capital stock."

"*Analysis capital structure on stock issue and exchange treasury stock situation; set up of merger and exchange of stock from legal and accounting standpoints.*" This item has to do with the same matter as does the one just preceding, as is brought out in Neukom's testimony:

"Q. [Referring to 'Analysis capital structure on stock issue and exchange treasury stock situation'] That means the same thing as 'analysis of merger agreement.' A. No, it goes further than that, because that was a situation that affected the two parties to the merger, because of the fact that I found after the meeting at which the merger contract was approved and confirmed that both parties apparently contemplated North Butte stockholders would only receive one share of ten dollar par stock for every share at fifteen, and I went further and worked out an analysis; as a result of that, later in the fall, when it seemed the more practical thing to do than to furnish available treasury stock, I worked out the treasury stock situation so that the company as a result of this action at that time, and because a lot of stock had been exchanged without objection by stockholders, they found themselves with 215,000 shares of treasury stock."

Neukom's testimony on this portion of the claimed services is seriously weakened by evidence that apart from the bonds and the $2,000 cash, he had been paid for special services on this very item. There was

introduced in evidence a voucher presented to the company on October 12, 1926, by Neukom and bearing his receipt, which voucher reads in part:

"Services rendered in connection with trip to New York for conferences with officers and general counsel of North Butte; *analysis of capital stock structure and treasury stock situation;* bond sales situation and stock for bond conversion; assistance in preparing bond sales and stock pool agreements; conferences with Carson at Chicago, etc. 17 days $850.00." (Italics supplied.)

*"Report and opinion affecting charter."* Neukom admitted that the inclusion of this item was a typographical error.

*"Preparation of date in financing bond sale campaign; miscellaneous consultations, conferences, etc."* Other than the voucher, there is only vague evidence on these items.

We turn now to a consideration of the evidence bearing upon the purported resolution of the North Butte directors, "That the acts of the Executive officers in the sale of $8,000. of the Company's First Mortgage * * * bonds * * * be, and the same hereby is, in all respects approved, ratified and confirmed."

The resolution is questionable upon its face, in that it speaks of a "sale" of the bonds rather than of their issuance in return for services, and in that the name of John W. Neukom does not appear in the resolution. Questioned as to why the resolution was in that form, Neukom said he did not know—was much surprised to find it that way. Yet he testified that he was present, not only at the meeting at which the resolution is asserted to have been passed, but also at the next succeeding meeting of the board of directors. At the second meeting the minutes of the first were read and approved, and it does not appear that Neukom raised any question as to the form of the resolution.

William P. Jahn, a director of North Butte, who was present at the meeting of December 28, 1926, testified: "No such resolution as that was offered at the meeting in my presence. I would have inquired why he got bonds, if that was the case. I afterwards, as soon as I found out, talked to John W. Neukom concerning the bonds; spoke of him about it in St. Paul, in the presence of Mr. Gow and Mr. Neukom. I said to Mr. Neukom, 'When was the resolution passed to give you eight thousand worth of bonds for services rendered. And where did you render any services'? 'Well', he said, 'That resolution was passed after the meeting adjourned or recessed and after you left the meeting', but I never left the meeting until it was adjourned or recessed."

We think the evidence clearly supports the finding of the trial court that the bonds in suit were not issued to Neukom pursuant to corporate authority.

If article VI, section 7, of the by-laws, governs, and makes a resolution of the board of directors necessary for the payment of such compensation, the defendant's evidence, if believed, clearly shows that the purported resolution was not a valid act of the board of directors.

Assuming that by virtue of article VI, section 2, the president and general counsel of the corporation might have contracted with Neukom without authority of the board to pay him $10,000 for his alleged services, and assuming further that the president and general counsel were authorized to issue corporate bonds by way of payment, the evidence is ample to support a finding that they were not within their authority in making this particular contract, inasmuch as it appears that, of the services claimed in the voucher to have been rendered by Neukom, some were rendered before there was any agreement, express or implied, to pay for them, some were otherwise compensated, and some were never rendered at all. Even if the president and general counsel had authority to make a contract for such inadequate consideration, Neukom can claim no benefit of such contract against the corporation. A director, he may also be a creditor, but, as a condition of asserting a valid claim against his corporation, he must make full disclosure of all circumstances bearing upon his claim. The voucher he presented to the corporation not only failed to make full disclosure, it was positively misleading.

It is admitted that appellant, Nan Neukom, stands in no better position than would her husband, John W. Neukom.

Affirmed.